Good morning, Your Honors. May it please the Court, Mary Ann Dugan for the Appellant Autotel. I would first like to address, well, I'd like to retain two minutes of rebuttal time, assuming that works out. I'd first like to address the good faith issue. As the Court knows, in the interim between filing the opening brief and then filing the supplemental brief, which was allowed by the mediator, and then the reply brief, this Court issued its ruling in Western Radio v. Qwest. And that took care of some of the issues regarding the good faith claim. So the Court held that it is required under prudential exhaustion doctrine to go to the state commission first with a good faith claim. As we explained in the supplemental brief, Autotel explicitly raised the good faith negotiation claim in its response to Qwest's motion to dismiss before the ACC that's in the ER at 141 and 142 and in the reply to the ACC, AR 151. The ACC code, the applicable state code, doesn't have any specific requirements as to how one raises a claim before the ACC. There's no specific requirement that such a good faith claim be raised in the first document filed with the ACC. And it was raised sufficiently for ACC to know what was being raised and for ACC to address that claim. Why don't you explain to us exactly what it is you're trying to claim was not good faith here? Well, Your Honor, the record is not developed on that issue, obviously, because the Court dismissed. But Autotel is claiming damages, as it is allowed to under 206 and 207 of the Telecommunications Act, for Qwest's failure to negotiate in good faith in negotiating this interconnection agreement, the claim is, and there's very little case law on good faith damages. But what Autotel is claiming is that both the delay and the nature of the negotiations caused damages, money damages to Autotel because it has not been able to interconnect as is necessary to compete with this incumbent monopoly provider. That just sounds like a disagreement with the outcome of the negotiations, not something having to do with the way they were conducted. Your Honor, as I said, the record is not developed on this, and if you have it, okay. But that's what you're, what you would like to be able to assert, but for the Western Bar. Well, under the Telecommunications Act. Are you asking for a remand on good faith? Or are you trying to say there wasn't good faith? We're asking for a remand on that issue, Your Honor. Definitely there's not enough evidence for this Court to hold that there was bad faith or to award damages. There's, there is evidence that Qwest, I mean, that Autotel exhausted its remedies as required by Western Radio v. Qwest. Okay. What is the, what is it that you call to the attention of the commission that it would have understood that it should have considered as it met, as having been bad faith? In the record at ER-141, in its reply, response to Qwest's motion to dismiss, Autotel stated that it explained why it was opposing the motion to dismiss and then cited the good faith provision in the regulations which track the good faith provisions in the statute. And then Autotel stated that Qwest has violated its duty to negotiate in good faith by requesting dismissal of Autotel's petition. That was in the response. In the reply in front of the ACC record at ER-151, Autotel stated that Autotel will be in an anomalous situation where Autotel is asking for damages before this Court as it is allowed to do, as this Court decided in Western Radio v. Qwest. But the ACC has no authority to award damages. So the question is why is it that we should remand to the ACC? I'm sorry, not to the ACC, Your Honor, to the district court. Well, for what? Because the district court has found that you didn't meaningfully raise the bad faith negotiation issue to the ACC. And we disagree, Your Honor. It was raised. I know you disagree, but what do we remand for, to order the district court to remand to the ACC or something? No, Your Honor. Just to find the issue was exhausted and to make a decision on whether it was or wasn't in good faith? Yes, Your Honor. The ACC hasn't made that decision. This Court's decision in Western Radio v. Qwest does not say that the ACC is supposed to try the issue of damages. And I'm not talking about damages. I'm talking about whether there was good faith negotiation. Okay. And what the ACC did was uphold Qwest's form of ICA, interconnection agreement, by definition thereby deciding that Qwest had negotiated in good faith. If you lose, that does not necessarily mean there has been bad faith, if you don't get the provision that you want in the contract. That's correct, Your Honor. It's a very specific issue of fact that needs to go to a fact finder. But what is the ---- what you ---- in what you just read to us, you mentioned limiting the scope of negotiation. What do you mean by that? What was the commission supposed to determine there? Well, what Qwest did, and this has come up over and over again, as Qwest points out, Autotel as a very small company has been diligent in fighting against larger companies, and it comes up all the time that these incumbents impose a take it or leave it contract of adhesion. Here's our interconnection agreement. Everybody else has gone with it. Why don't you just take it? And that is what has happened here. And by doing that, what we would argue if once we are allowed to do discovery and have a trial is that by doing that, Qwest has acted in bad faith and has caused Autotel damages. Now, the issue of exhaustion, I would just point out that in Western Radio there was a bit of a procedural anomaly in that the state commission there had not yet ruled at the time the district court was looking at the good faith issue. And so this court noted in the Western Radio case that there was no PUC order for the district court to review at the time. And so this court remanded and said take a look at the PUC order. Here, the ACC had already issued its order, and what the Western Radio court said in this court is that PUC's ruling that Qwest's agreement complies with the arbitration order may constitute a decision that Qwest negotiated in good faith, but it happened after the district court dismissed the good faith claim. And so, Your Honors, here I would argue that if the Petitioner presents the good faith claim to the commission and the commission then rejects the Petitioner's arguments and adopts the incumbent's ICA, that by definition it has held and it has sufficiently exhausted the good faith claim to present it then to the district court as a claim for damages. It's an issue of first impression, Your Honors, other than the Western Radio case, which provides some guidance to you on that. Regarding the record augmentation, motion to strike issue, I'd just briefly like to go to the other issues where you think that the district courts were wrong. Thank you, Your Honors. The single point of presence issue, the ‑‑ I would just reiterate that this is a case where the burden is on Qwest, as we fully briefed, to demonstrate that the interconnection to a single point in the network is not feasible, and they have not done that. The Act uses the term network. The question then becomes what is Qwest's network? There are two LATAs, L-A-T-A's, in Arizona. And as the record shows, Qwest is no longer restrained in transmitting its own calls between those two LATAs. That's in ER 219 and ER 25 to 26. And so ‑‑ I'll just ask you, what standard are we applying to determining whether these decisions were correct or not under the law? Is there any deference to anybody? Is it a pure question of law? Well, I think you do have a mixed question of law. In fact, at this point, I don't think, however, that the facts are disputed because at oral argument, Qwest admitted, it's correct, we don't have a limit anymore if you look at the context, 25 to 26. We don't have a limit on the ‑‑ So the issue is whether interpreting the Act, these determinations as to the obligations  Yes. I think what you have, because the facts aren't really disputed at this point, that you have an issue of law which was addressed in the Jennings case. The Jennings case talked about, said that the incumbent can't require the requesting carrier to connect at every point within a LATA. And so the Jennings case does not, is not on all fours with this case. So Jennings establishes that the incumbent cannot require the requesting carrier to connect at every single access point within the LATA. So in Jennings, the network that was at issue was the LATA. The Act says network. That's the word that's used, not LATA. And so we're arguing, Your Honors, that since Qwest is no longer restrained in transmitting its own calls between the two LATAs in Arizona, that it also cannot restrain, cannot tell, auto tell, you must connect at every single point. When the Arizona Corporation Commission reviewed the contract, did it resolve these issues in favor of Qwest? Yes, Your Honor. What difference do we give to the ruling of the Arizona Corporation Commission? Well, the Arizona Corporation Commission is not allowed to impose a provision that violates the Act. And we argue, Your Honor, that they did, because the act. Yes. Do we give any deference to those, that ruling of the Corporation Commission? Well, I don't think no. You can't defer if the language we are challenging in the ICA clearly violates the Act. So it has to clearly violate the Act? I don't know that there's a case saying whether it has to clearly violate the Act. Well, you're the one who said if it clearly violates the Act. I think it does here. It does clearly violate the Act. I don't know. I understand you think it clearly violates it. My question is, is that the determination we're supposed to make, whether it clearly violates the Act? The ACC is not allowed to impose provisions on the requesting carrier that violate the Act. I don't believe the case law or the Act itself says clearly. I used that word because I do believe it does clearly violate the Act here. And the provision of the Act that's violated is what? The Act says that the incumbent must allow interconnection at any technically feasible point in the carrier's network. And that was interpreted in Jennings to say that they can't make you make the requesting carrier connect at every technically feasible point in the network because that adds costs. And your position is that in this case they were requiring you, the contract requires you to connect at every point? Yes. That's in the ER at both 78 and 96, two parts of the interconnection agreement. ER 96 says Autotel must order Type 2 trunking to each Quest access tandem, which is explicitly in violation of Jennings. There is an issue of fact also for remand in that there seems to be a question of how many access points were within the LADA, and that's not something we were able to determine because we weren't allowed to proceed through discovery. The FCC has weighed in on this in the first report in order, saying that the incumbent must allow novel uses of its network, must adapt their facilities. It bars, the Act bars consideration of costs in determining whether something is technically feasible. My understanding is that the connection with the two LADAs, the real problem is that what you wanted would require Quest to restructure in order to accommodate what it says is obsolete technology. That's the dial pulse issue. That's the second issue, the next issue. But I believe Your Honor is correct that they did, Quest did argue that they would have to restructure to transmit calls between the LADAs. It turned out at oral argument they acknowledged that that was no longer true. That requirement expired. That limit on their system expired December of 06. So we have some issues of fact, but I think they were resolved at oral argument. Okay. You have a couple of seconds left if you want to reserve them, and we'll hear from you. Thank you very much. Quest, Senate Commission. May it please the Court, Maureen Scott, on behalf of the Arizona Corporation Commission. I will be taking the first six minutes, and Greg Monson from Quest will take the additional nine minutes today. The Arizona Corporation Commission requests that you affirm the ruling of the Court in all respects. It's a well-reasoned decision. The Arizona Commission's arbitration order complies with the Telecommunications Act of 1996, and its findings of fact are supported by substantial evidence. And with respect to your questions regarding the standard of review, it's the Commission's position that with respect to legal determinations or whether a provision complies with the Act, your review of that would be de novo. But where there are factual findings that the Commission has made, there should be deference to the Commission's determinations in that regard, and if they are supported by substantial evidence, they should be affirmed. With respect to the good faith claim that Autotel has presented to you, it is the Commission's position that that claim was never raised to the Commission. Section 252E6, as you know, provides that only State Commission determinations and failure to act are reviewable by the Federal District Court. This court in the Western Radio case found that prudential concerns required that Western present its good faith claim to the Commission first before it proceeded in Federal District Court. The Act also limits the Commission's review of issues presented to it in an arbitration proceeding to those presented in the petition by the applicant or to those presented or raised in the response by Quest. In this case, Autotel raised four issues in its petition for arbitration. None of those issues went to good faith negotiation, and Quest in its response did not raise any good faith negotiation claims. Now, what Autotel relies upon to say that we had the issue before us is a reference it made in response to Quest's motion to dismiss its arbitration petition, and what it said in that regard is we want to remind Quest of its obligation to negotiate in good faith. Well, that certainly can't be construed as raising a good faith negotiation claim to the Commission for the Commission. Well, wasn't there at least arguably a reference to failure to negotiate with respect to connections? That, Your Honor, with respect to the midpoint meet or the midpoint meet point, yes, there was a reference in the reply brief with respect to negotiation, a good faith negotiation requirement being there. But it was never listed 1, 2, 3, 4. No, but the issue was not presented to the Commission for a decision. All there was was a fleeting reference in the reply brief of Autotel to the fact that they felt that if the Commission decided the issue in Quest's favor, that somehow that good faith negotiation claim would be implicated. If you were to prevail on the good faith issue, that then leaves us with a series of disagreements with the decision, the merits of the decision, which are then reviewable de novo? Not necessarily, Your Honor, because with respect to these various points that are raised, there are substantive reasons why the Commission went in the direction it did. So if you decide the good faith negotiation claim in our favor, it wouldn't necessarily dispose of all of the issues. No, no, I wasn't suggesting that it disposes. I said it leaves us then to determine the merits of their claims as to each of those issues. Yes, that would be. And those are determined de novo, at least when they're legal questions. Yes, and where it's a mixed question of law and fact, the substantial evidence standard would apply. Why don't you briefly address the legal issues that are raised in those remaining points? Okay. With respect to the Telecommunication Act claims that the applicant has or the appellant has brought before you, the single point of interconnection, Autotel has argued that it's entitled to one single point of interconnection for Quest's entire network. This goes back, Autotel. I thought it was just two lattice. There are two lattice. And this Court has previously held, as has the Arizona District Court, that a competitive carrier is entitled to a single point of interconnection within each lattice. And that is exactly the case. That was when the issue was can I get one in that lattice, not whether they could have one for more than a single lattice. Your Honor, there are two lattice in which Quest operates in Arizona. Arizona actually has four lattice. Quest operates in two of them. And Quest has a single access tandem in each of those lattice. Quest, under its agreement, allows Autotel interconnection at that single point within each lattice. So the commission believes that Quest has complied with the law by making available in each lattice a single point of interconnection. What does the statute tell us, if anything, about whether they should have a single access point for the two lattice or two access points for the two lattice? Is there anything that helps in the law? The law, I think you'd have to make reference to both Section 271 and Section 251 when you would look at the law pertaining to that issue. Under Section 271, the lattices are still in place. It is true that Quest, since 2003 now, can provide interlattice traffic across those boundaries or can provide interlattice toll. But under Section 272, there was a separate affiliate requirement, and that was just sunsetted in 2006. Okay. You've used more than the time that you wished, and maybe we should hear from Quest on some of these issues seem to be getting into their territory. Thank you. Thank you. My name is Greg Monson, and I'm representing Quest. Mr. Monson, before I lose the point, what is the practical significance of access to a single point within each lattice or not? The practical aspect of that and the evidence in the record is Quest does not have a trunk between its access tanyms in the two lattice. It cannot transport traffic between those two points. Is there a record somewhere that says where do we find the evidence or the explanation? We've included that in our supplemental excerpts of record, but that wasn't a disputed point. There is no trunk between those tanyms, so we cannot transport traffic between them. And there's been confusion in the argument today about that, but the point is historically it's never been there. It's still not there. There was various reasons for that, but we don't have it. So we didn't frame the issue as one of technical feasibility, but I guess it really is an issue of technical feasibility. As you're explaining it, it's not really a question that the statute will answer. It's a question that you cannot do it. The statute prevented us from doing it when it was passed, the Act, under Section 271, but we got relief under 271, so now we can do it, but it's for the purpose of acting as an inter-exchange carrier and transporting calls for customers who subscribe to our service as an inter-exchange carrier. We do not transport traffic between the tanyms or the lattice for ourselves or for anyone else. We don't have facilities to do it. Okay. Now, the other question about the two sides of the pole or whatever it is, where you have to do it on the line side, on the trunk side under the statute, and the issue is that they want you to use what you consider to be outmoded equipment on the trunk side, or is it the line side? Your Honor, I would be in excess of my knowledge if I pretended I knew that with certainty, but we have to allow interconnection on either side, but the signaling that they want is outmoded. Again, the record before the commission was undisputed and clear that that type of signaling is outmoded. We do still have it in our network in certain places. It's grandfathered for service to certain customers, and where it's available, we agreed to provide it to them, but we said we can't be required to provide it where it's not there, and that's where I made my famous analogy that that would be, if they said the only thing they could use was an operator switchboard with manual connections, would we be required under the Act to go back and provide that? I don't think so, and this is similar to that. It's obviously not the same case, but. Well, if they had the modern, newest equipment, could you do it on both the trunk and line side? Well, we could do it. We interconnect with many, many carriers and provide signaling under, it's called signaling system seven, but we also still have a multi-frequency signaling system available also. My question is, and I don't know that I have any idea about what I'm talking about, but the statute seems to say, if I'm correct, that you have to provide access on both the trunk and the line side. We have to provide it at any technically feasible point. Yeah. And is it technically feasible these days to provide it on both the trunk and the line side? I believe so. So you say you could do what they want if they used a different kind of equipment? If they, we are willing to give them connection wherever they want it, but it's connection to our network, and we don't have, at every place in our network, the ability to provide that kind of signaling because it's outmoded and we don't have it on our network. So we would have to reinstall it just for them. And what would that mean, that you would have to? We'd have to program the switches to. Well, I mean, you know, so what does that involve? You put a nail in the pole and you reprogram the switches? Are we talking about expending billions of dollars? What does it involve? What kind of a burden is it? I don't know how much it costs, Your Honor, but it's a question of going back in time. Is it a different technology? To install an old technology, yes. And I don't know how much it costs, but, I mean, those types of signaling are the old, you remember when you used to dial a phone and you'd hear a dip, dip, dip, dip, dip, or when you dialed a rotary dial and click, click, click, click, click. Those are the types of signaling they want. And where they're available, we'll provide them, but they aren't available in many places on our network anymore, and the evidence was clear on that point. Did the magistrate deal with this issue in adequate way? Well, the magistrate upheld the Arizona Commission's decision on the basis that it was an outmoded technology, that it was a reasonable accommodation of interconnection to provide it where it was available, but we shouldn't have to go back and reinstall it to provide it where it wasn't available. And it was fairly explicit on that. Yes, yes. If I could, I want to address the good faith issue just for a moment. On the good faith claim, I think the important point is, is that Autotel did not raise that claim with the district court. In other words, in other words, Quest and the Commission told the district court that you have to dismiss that claim because Autotel did not raise it before the Arizona Commission, and in faced with that argument, Autotel did not claim that it raised the issue with the Arizona Commission. Now they're grasping at straws. Now they're saying, well, let's look back through the record and see if we ever used the word good faith negotiation, and they found a few places where they did. But at the time this was before the district court, they didn't make that argument, so it's my position they're barred from making that argument in this court. Furthermore, when they filed their complaint in the district court and made their allegation of good faith, the issue they focused on was whether or not Quest had provided an agreement following the arbitration that that was consistent with the decision of the Arizona Commission. That was the allegation they made in their complaint. Now they come before this court and they have a whole different allegation. The allegation before this court is that in filing a motion to dismiss or in arguing about mid-span meet point negotiations that we did not act in good faith. I think they're grasping at straws. I think that's apparent. And I think the court should not listen to those claims because they were not made to the district court and therefore not properly raised in this court. This issue of technical feasibility receives a lot of attention on the technical issues. Quest recognizes that it has a duty to provide interconnection at any technically feasible point. But what AutoTel misses is that doesn't mean that we have to provide interconnection without terms and conditions which adequately compensate us for the use of our network. And what the Arizona Commission did was it imposed reasonable terms and conditions for interconnection at technically feasible points and appropriately accommodated that interconnection. So we believe the Arizona Commission's decision and the district court's decision should be upheld. Thank you. Very briefly. Yes, Your Honors. I'll be real brief. It's incorrect that Quest can't transport traffic between their Ladas. And in the record at ER 25 to 26, their counsel explicitly said, it's correct we don't have a limit on that traffic, but the fact is we don't do it. In other words, we could do it, but we don't. They could do it. They actually petitioned for the right to do it so that they can carry their own traffic. It's part of their network now. Regarding the issue of the dial pulse technology, the court incorrectly held that Autotel had the burden to prove that this was feasible. That's in the record at 38 to 39. But the ACC specifically found that dial pulse signaling is technically feasible. That's in the record at ER 160. This word obsolete is not in the act, and Quest admits it uses it itself. And there's nothing in the record below about what it would cost them to allow Autotel to also use that technology. And it's not at all like his famous analogy of a switchboard. There are no switchboards anymore. Quest didn't argue below that it was technically infeasible. And so we're, you know, the plain language of the act. I think we understand your position and have used your time. Thank you very much. Thank you. The case just argued is submitted for decision.
judges: Schroeder, Nelson D. W., Marshall